**STATE of Missouri, Respondent,**

**v.**

**Khyree D. DAVIS, Appellant.**

**No. ED 103948**

Missouri Court of Appeals,
Eastern District,
DIVISION FOUR.

Filed: June 20, 2017

FOR APPELLANT: Emmett D. Queener, Woodrail Centre, 1000 West Nifong, Building 7, Suite 100, Columbia, Missouri 65203.

FOR RESPONDENTS : Joshua Hawley, Nathan J. Aquino, 221 West High Street, P.O. Box 899, Jefferson City, Missouri 65102.

## OPINION

James M. Dowd, Presiding Judge

Khyree Davis was convicted after a jury trial in the Circuit Court of St. Louis County of one count of the unlawful use of a weapon, an associated count of armed criminal action, and one count of second-degree murder. Davis was sentenced to concurrent terms of twenty-five, three, and twenty-five years in prison, respectively. On appeal, Davis contends (1) the trial court clearly erred by denying his motion to suppress and admitting into evidence his statements to a police detective that he asserts were involuntarily made and coerced in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and his right against self-incrimination; (2) the court abused its discretion by excluding evidence regarding his brother KeyJuan's death; and (3) the court plainly erred by allowing Davis's probation officer to testify about his statements to her.

We find that Davis's statements to the detective were voluntarily made and were not coerced; that Davis has failed to show he was prejudiced by the exclusion of evidence regarding KeyJuan's death; and that Davis either waived his objections to the admission of his probation officer's testimony about his statements to her, or those statements were cumulative to the detective's testimony about the statements Davis made to him. Accordingly, we affirm on all points.

## Factual and Procedural Background

On June 3, 2013, thirteen-year-old Tavelle Coleman ("Victim") was fatally shot through the screen door of a residence on Duke Drive in the Castle Point area of St. Louis County. The shooting occurred at the end of a conflict-filled day during which Davis's younger brother KeyJuan, who was either seventeen or eighteen years old, had attempted to steal money from Victim and had gotten into a series of physical altercations with Victim and his younger brother, Delano Coleman. After the last fight before the shooting, in which Davis assisted KeyJuan, Davis told Victim, "Somebody is going to die tonight." Davis then drove away from the scene with KeyJuan in his girlfriend's black Ford Crown Victoria only to return later in the same vehicle and fire a .380 automatic pistol from outside the front of the house on Duke through the screen door, hitting and killing Victim.

On the morning of June 4, 2013, Davis was arrested. That afternoon, he was interviewed at the police station by Detective Christopher Steib, who also interviewed Davis's girlfriend. At the outset of Davis's interview, Detective Steib read him the *Miranda* warnings, which Davis confirmed in writing that he understood. Davis initially denied any involvement in the shooting, but later confessed that he borrowed a .380 automatic pistol, drove the Crown Victoria to the house on Duke Drive, and fired four or five shots into the house.

The State charged Davis with the unlawful use of a weapon; an associated charge of armed criminal action; and second-degree murder on a felony-murder theory,

with the unlawful use of a weapon as the predicate offense. Davis filed a motion seeking to suppress his statements to Detective Steib, but the court denied it on the grounds that, by speaking with Detective Steib, Davis had voluntarily and intelligently waived his *Miranda* rights.

For its part, the State sought to prevent Davis from proving that Key Juan was unavailable to testify because he died two years after the events here. The court granted the State's request.

At trial, Davis testified he confessed to Detective Steib solely because he wanted to protect his family. He testified he had actually spent the evening of June 3, 2013 with family members, smoking marijuana and drinking alcohol, and had not gotten back into the Crown Victoria after driving away after the last fight before the shooting.

The jury found Davis guilty on all three charges, and, after sentencing Davis, the court denied his post-trial motions. This appeal follows.

## I. The Denial of Davis's Motion to Suppress and the Admission of His Statements to Detective Steib

In his first point on appeal, Davis contends the trial court clearly erred by denying his motion to suppress the evidence of his statements to Detective Steib he asserts were involuntarily made and coerced in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and his right against self-incrimination. In his interview with Detective Steib, Davis admitted he was involved in the shooting in this case: he said he borrowed a .380 automatic pistol, drove his girlfriend's vehicle to the house on Duke Drive, stopped in front, and fired four to five rounds into the house from the driver's seat before driving away. Assuming *arguendo* that Davis's claim the court

should have suppressed these statements was preserved, we find that Davis's statements were in fact voluntarily made and were not coerced, and thus the court did not clearly err.

We review for an abuse of discretion the trial court's decision whether to grant a motion to suppress. *State v. Feldt*, 512 S.W.3d 135, 152 (Mo. App. E.D. 2017) (citing *State v. Selvy*, 462 S.W.3d 756, 764 (Mo. App. E.D. 2015); *State v. Milliorn*, 794 S.W.2d 181, 183 (Mo. banc 1990)). We reverse only if the court's decision is clearly erroneous. *Id.* (citing *Milliorn*, 794 S.W.2d at 183). Our review is limited to determining whether the court's decision is supported by substantial evidence. *Id.* (citing *State v. Stover*, 388 S.W.3d 138, 149 (Mo. banc 2012)). In determining whether there was substantial evidence to support the court's ruling, we consider both evidence presented at trial and any evidence presented at a pretrial hearing on the motion to suppress. *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005). We view the facts and any reasonable inferences therefrom in the light most favorable to the court's ruling and disregard any contrary evidence and inferences. *Feldt*, 512 S.W.3d at 152-53 (citing *State v. Johnson*, 354 S.W.3d 627, 631-32 (Mo. banc 2011)). We defer to the trial court's determinations of the weight to be given to the evidence and of the credibility of the witnesses. *Id.* at 153.

However, the ultimate issue of whether the Fifth Amendment or any other provision of the United States Constitution was violated is a question of law that this Court reviews *de novo*. Thus, while we review for abuse of discretion the trial court's broader decision whether to suppress evidence, we reach our own, independent determination whether any of the defendant's constitutional rights, including

his privilege against forced self-incrimination, was violated. *See State v. Norman*, 431 S.W.3d 563, 568-69 (Mo. App. E.D. 2014) (noting that "[w]hen the issue to be decided involves the constitutional protection against forced self-incrimination," we "consider the court's conclusions of law *de novo*"); *cf. Feldt*, 512 S.W.3d at 153 (elucidating these principles of independent review with regard to Fourth Amendment questions).

■■■ The Due Process Clause bars involuntarily-obtained confessions from being admissible at trial. *State v. Faruqi*, 344 S.W.3d 193, 203 (Mo. banc 2011) (citing *Ashcraft v. Tennessee*, 322 U.S. 143, 155, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) ("The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession.")). The test for voluntariness is whether the totality of the circumstances created a physical or psychological coercion that deprived the defendant of a free choice to admit, deny, or refuse to answer the examiner's questions. *Id.* (citing *State v. Simmons*, 944 S.W.2d 165, 173 (Mo. banc 1997)). In determining whether coercion occurred, we consider a range of factors relating to the defendant, including his age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion. *Id.* We also consider whether the defendant was advised of his rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of coercive techniques such as deprivation of food or sleep. *Id.*

Here, we find Davis's confession and other statements to Detective Steib were voluntary and were not coerced. On the morning of June 4, 2013, Davis was arrested and brought to the police station for questioning. Davis was brought into the interview room at 10:18 a.m. Detective Steib entered the interview room at 1:43 p.m. No other officers had interviewed Davis, and Detective Steib engaged in a one-on-one interview with Davis. Detective Steib provided *Miranda* warnings at the beginning of the interview using a "warning and waiver" form. Davis twice acknowledged that he understood the warnings, and he signed the form.

During the interview, Davis was provided with water, cigarettes, and restroom breaks. He was permitted to visit with his girlfriend. Detective Steib testified that during the interview, he did not threaten or coerce Davis, did not physically touch him, and did not promise him anything in return for making any statement. Detective Steib also testified Davis agreed to speak with him without an attorney present, responded feely to his questions, and never stated he did not want to talk to him. Detective Steib testified he repeatedly told Davis that no matter what he said, he would remain in police custody after the interview.

Approximately two hours and fifty minutes into the interview, Davis confessed to shooting at the house on Duke Drive. The entire interview lasted about five and a half hours.

We find no evidence in the record that Davis was unusually susceptible to coercion or that any personal quality or characteristic made it more likely that Detective Steib's interview tactics coerced him. We observe that Davis has experience with the criminal justice system; he testified he had felony convictions for possession of marijuana and resisting arrest, and that this was not his first time being interviewed by police. We also note that at trial, Davis testified he had spoken voluntarily with Detective Steib and had not been coerced.

Davis argues on appeal, however, that Detective Steib coerced his confession by

making an implied promise of leniency, and that by implicating his girlfriend and his family, including KeyJuan, in criminal conduct, Detective Steib unduly pressured Davis into covering for them. Davis claims Detective Steib made an implied promise of leniency when he told Davis that the difference between him being charged with first-degree murder and either second-degree murder or manslaughter was whether the shooting in this case was intended to hurt or kill someone or whether it was done just to scare someone and the shooter did not know anyone was inside the house.

With regard to being pressured to cover for others, Davis asserts it was improper for Detective Steib to state that based on the evidence he had reviewed, if Davis was not involved in the shooting, then KeyJuan must have been, and he would be charged with first-degree murder. Davis also claims he was unduly pressured to confess when Detective Steib stated that he had spoken with Davis's family and his girlfriend; that their accounts of facts relevant to the shooting were different than what Davis had so far admitted; and that if any one of them was lying to the police they would be jailed for doing so.

We find no coercion. Detective Steib made no promise or threat; rather, he merely described how the potential range of legal consequences for shooting into the house on Duke Drive depended on the intent of the shooter. He did not promise any particular consequence or which charge the State would bring if Davis confessed. Nor did he threaten Davis that he or anyone would be punished specifically because he did not confess. Detective Steib simply stated he would book Davis and KeyJuan for first-degree murder based on the facts as he understood them, unless Davis said something that altered those facts. Likewise, Detective Steib did not

threaten Davis's girlfriend or any of his family members; he merely indicated that if they were lying, they were subject to the legal consequences for lying to the police.

The Missouri Supreme Court has held that statements made by police distinguishing first-and second-degree murder were not coercive even where the police specifically told the defendant, "If it wasn't premeditated murder, you know, then you shouldn't be prosecuted for premeditated murder." *State v. Schnick*, 819 S.W.2d 330, 336 (Mo. banc 1991). Even though this statement, like some of Detective Steib's, suggested that a confession consistent only with a lesser offense might result—if it convinced the State—in prosecution only for the lesser offense, the Court concluded the statement did not constitute an implicit or explicit promise of possible leniency or mitigation of punishment. *Id.* The Court stated, "If defendant had a hope of leniency, that hope 'springs from the seeds of his own planting and is not sufficient to render the resulting confession inadmissible.'" *Id.* (quoting *State v. Hunter*, 456 S.W.2d 314, 321 (Mo. banc 1970)). The Court further observed, "General encouragement to cooperate is far different from specific promises of leniency." *Id.* at 337.

Here, as in *Schnick*, the alleged promises or threats by police amount only to explanations of how the defendant's interview answers, as reported to the prosecutor, might afford the State a factual basis to charge the defendant with a lesser offense. Further, Detective Steib made it clear to Davis he did not get to decide what to charge him with. Detective Steib provided at most general encouragement to cooperate.

 It is not coercive to point out the obvious reasons why it might be more favorable to a defendant to give a truthful confession to a lesser offense than that with which the defendant might otherwise

have been charged, or why it might be wise not to lie to the police. Indeed, pointing this out was not coercive because Detective Steib merely explained what he believed to be the differences between first-degree murder and either second-degree murder or manslaughter in response to *Davis's inquiry*. Davis asked Detective Steib whether and to what extent it would make a difference if he had "go[ne] over [to the house on Duke Drive] to kill with intent." It is not coercive for a detective to respond to a suspect's question in the manner Detective Steib did here.

■ And, finally, a confession will not be held to be involuntary because a defendant confesses from a desire to protect a family member. *State v. Kimball*, 613 S.W.2d 932, 942-43 (Mo. App. S.D. 1981) ("The fact that a criminal defendant's confession is prompted by a desire to shield a relative from the rigors of arrest, interrogation and confinement does not of itself render his confession involuntary; he may 'take the blame,' as it were, to exculpate someone else.").

Point I is denied.

## II. The Exclusion of Evidence Regarding KeyJuan's Death

■ In his second point, Davis claims the court abused its discretion by excluding any evidence regarding Key Juan's death. Assuming *arguendo* that the court erred, we find no prejudice resulted from the court's exclusion of such evidence.

Davis argues he should have been permitted to adduce evidence KeyJuan had died a couple of months before trial—about two years after the shooting—to explain why someone integral to the events of the night in question was not being presented to the jury to testify regarding those events. Davis asserts that in the absence of that explanation, the jurors could have inferred KeyJuan was not

called as a witness because he would not support Davis's defense.

■ On appeal, we review the trial court for prejudice, not mere error, and reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Battle*, 415 S.W.3d 783, 787 (Mo. App. E.D. 2013). Trial court error is not prejudicial unless there is a reasonable probability that the error affected the outcome of the trial. *Id.*

Davis failed to preserve this issue for appeal. Nevertheless, even if it had been preserved, and even if we assume *arguendo* that the court abused its discretion in excluding the evidence of KeyJuan's death, Davis nevertheless has failed to demonstrate that there is a reasonable probability the outcome would have been different had the evidence been allowed.

We are unconvinced of the premise of Davis's argument: that the jury's failure to hear from KeyJuan and the trial court's refusal to allow Davis to explain KeyJuan's absence was in any way outcome-determinative. Davis has failed to show that had KeyJuan been alive and available to testify, his testimony would have been favorable to Davis.

Point II is denied.

## III. The Admission of Davis's Probation Officer's Testimony About Davis's Statements to Her

In his third point, Davis concedes he has not preserved the issue and argues the court plainly erred by allowing Davis's probation officer to testify about his statements to her. We find no such error because Davis either waived his objections to the admission of his probation officer's testimony, or Davis's statements to her were cumulative to Detective Steib's testimony about Davis's statements to him.

The trial court allowed Davis's probation officer to testify that Davis told her he committed the crime—he got a gun from a man called "Shank" and, in retaliation for harming KeyJuan, shot into the house on Duke Drive and killed someone. The court also permitted the probation officer to testify Davis said that after drinking and smoking marijuana, he and another person drove in his girlfriend's vehicle to the house.

Davis requests that this Court review for plain error, pursuant to Rule 30.20 [1]. We exercise our discretion to review for plain error only where the appellant asserting error establishes facially substantial grounds for believing that the trial court's error was evident, obvious, and clear, and that manifest injustice or a miscarriage of justice has resulted. Rule 30.20; *State v. Feldt*, 512 S.W.3d 135, 143 (Mo. App. E.D. 2017) (*State v. Jones*, 427 S.W.3d 191, 195 (Mo. banc 2014)). Here, Davis fails to establish grounds for finding plain error.

Section 559,125.2 [2] provides, in part, that "[i]nformation and data obtained by a probation or parole officer shall be privileged information and shall not be receivable in any court." The purpose of this provision is that the probationer know that information learned by the probation officer will be held in confidence. *State v. Renfrow*, 495 S.W.3d 840, 843 (Mo. App. W.D. 2016) (citing *Richardson v. Sherwood*, 337 S.W.3d 58, 65 (Mo. App. W.D. 2011)). The statute does not authorize discretion. *Id.* (citing *Sherwood*, 337 S.W.3d at 65).

 However, it is not error to admit normally inadmissible evidence over objection when the evidence is cumulative. *State v. Dale*, 874 S.W.2d 446, 452 (Mo. App. W.D. 1994). Thus, it was not error for the trial court to admit Davis's probation officer's testimony that he told her he borrowed a gun, drove his girlfriend's car to the house on Duke Drive, and, in retaliation for one of its residents harming KeyJuan, fired his weapon into the house—Detective Steib had already testified, or the video recordings presented to the jury of Davis's police interview with Detective Steib had already shown, that Davis had admitted as much.

 Further, Missouri courts have found waiver to exist in a number of circumstances. The "at issue" waiver is prominent among them. *State ex rel. St. John's Reg'l Med. Ctr. v. Dally*, 90 S.W.3d 209, 215 (Mo. App. S.D. 2002). The "at issue" waiver occurs when the privilege holder makes assertions in a litigation context that put its otherwise privileged communications in issue. *Id.* Privilege may also be waived when invoked in some fundamentally unfair way. *Id.* The so-called "fairness doctrine" is grounded in the notion that it is unfair to permit a party to make use of privileged information as a sword when it is advantageous for the privilege holder to do so, and then as a shield when the party opponent seeks to use privileged information that might be harmful to the privilege holder. *Id.* (citing *In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987)). The rationale is that a party should not be able to use a privilege to prejudice an opponent's case or to disclose some selected communications for self-serving purposes. *Id.* (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)). Accordingly, a privilege may be waived when a party asserts a claim that in fairness requires examination of protected communications. *Id.* (citing *Bilzerian*, 926 F.2d at 1292).

---

1. All rules references are to the Missouri Supreme Court Rules (2016).

2. All statutory references are to RSMo. 2000 unless otherwise indicated.

On this record, Davis waived his privilege against the admission of the testimony of his probation officer about his statements to her, at least as to those parts of the testimony that were not also cumulative. Before the probation officer testified, Davis in his own testimony acknowledged they had spoken, and he denied that he told her he possessed a gun and fired into the house on Duke Drive; killed a person; borrowed a gun from someone called "Shank"; or had been drinking and smoking marijuana before driving over to the house and shooting out of his girlfriend's vehicle's window. Davis thus put at issue whether he had told his probation officer each of these pieces of information. This was certainly an "at issue" waiver.

Moreover, the "fairness doctrine" applies here and supports a finding of waiver. It would have been unfair for the court to allow Davis to both deny making particular statements to his probation officer, and to cite the "probationer" privilege to prevent the State from presenting contradictory testimony from the probation officer. That would have enabled Davis to use the privilege as a sword and a shield; the result the "fairness doctrine" directs Missouri courts to avoid.

Point III is denied.

## Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

Kurt S. Odenwald, J., and Gary M. Gaertner, Jr., J., concur.